

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-11-1996

# Exxon Shipping Co. v. Exxon Seaman's Union

Precedential or Non-Precedential:

Docket 95-5027

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

### Recommended Citation

"Exxon Shipping Co. v. Exxon Seaman's Union" (1996). *1996 Decisions.* Paper 243.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/243

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 95-5027


EXXON SHIPPING COMPANY,
<u>Appellant</u>

v.

EXXON SEAMAN'S UNION



On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 93-cv-00689)

Argued September 11, 1995

Before:  Before: SLOVITER, <u>Chief</u> <u>Judge</u>, ALITO, <u>Circuit</u> <u>Judge</u> and
RENDELL, <u>District</u> <u>Judge</u>[298]

(Opinion Filed  January 11, l996)

Richard R. Cerbone (Argued)
Carlin, Maddock, Fay & Cerbone
Florham Park, NJ 07932

Douglas B. Neagli
Exxon Company, U.S.A.
Houston, TX  77002

Patrick J. Conlon
Joseph T. Walsh, III
Exxon Company, U.S.A.
Florham Park, NJ  07932

        Attorneys for Appellant

David Grossman (Argued)
Howard A. Goldberger
        of Counsel
Schneider, Goldberger, Cohen, Finn,
Solomon, Leder and Montalbano, P.C.
Kenilworth, NJ  07033

Attorneys for Appellee

Peter A. Susser
Littler, Mendelson, Fastiff,
Tichy & Mathiason
Washington, DC  20005

Attorney for Amicus-Appellant,
Institute for a Drug-Free Workplace

OPINION OF THE COURT

SLOVITER, Chief Judge.

Exxon Shipping Company appeals from a district court order which declined to vacate and instead confirmed and enforced an arbitration award reinstating an Exxon employee who had been discharged for refusing to submit to a drug test.  We will affirm.

**I.**

The collective bargaining agreement ("Agreement") between Exxon Shipping Company and Exxon Seamen's Union expired on August 31, 1987.  After eight months of negotiating for a successor agreement, Exxon, in a letter sent on March 29, 1988 to all oceangoing employees, declared an impasse and advised the Union and its members that Exxon's final proposals would be implemented on April 1, 1988.

The March 29 letter stated that the terms of the new working relationship between Exxon and the Union would include, inter alia, the company's Drug and Alcohol Policy and any provisions of the expired Agreement that were not part of the negotiations.  That "Policy Statement on Employee Alcohol and

Drug Use," issued with the March 29 letter, contained the following language:

> Exxon Shipping Company may from time to time conduct unannounced searches for drugs and alcohol on owned or controlled property. The Company also has the right to require employees to submit to medical evaluation or alcohol and drug testing <u>where cause exists to suspect alcohol or drug misuse</u>. <u>A positive test result or refusal to submit to a drug test is grounds for disciplinary action, including dismissal</u>.

App. at 44 (emphasis added).

Exxon amplified its Drug and Alcohol Policy in a letter sent to all oceangoing employees on September 27, 1988. Exxon explained it would be aggressively enforcing its Alcohol and Drug Policy and gave "<u>official</u> <u>notice</u>" that violation of the policy "will result in immediate termination from the vessel." App. at 49-50 (emphasis in original).

One of the terms of the Agreement remaining in effect during the negotiations was a "Discipline" section, which stated that "there will be posted . . . a list of rules which <u>shall constitute cause</u> for which unlicensed personnel <u>may be discharged</u> without further notice." App. at 147 (emphasis added). Included on this list was "[i]nsubordination, including failure or refusal to perform work assigned." App. at 128a. A provision of the Agreement providing for grievance and arbitration of disputes also remained in effect.

The case before us stems from Exxon's discharge of Alan B. Cash, a thirteen-year employee who started with Exxon as a seaman and advanced to chief pumpman. The duties of a pumpman include loading and unloading cargo and properly aligning pumps

for the transfer of products.  The parties do not dispute that it is a safety-sensitive position and is subject to Coast Guard regulations pertaining to drug testing.

On or about May 10, 1989, Cash was transferred from the Exxon Benecia in Japan to the Exxon Washington, anchored in San Francisco Bay.  For the period of May 10-15, Cash resided in the second pumpman's room of the Exxon Washington.  On May 15, the chief pumpman of the Exxon Washington vacated the ship and Cash moved into his room.  On May 17, Exxon conducted an unannounced drug search of all the rooms of the Exxon Washington.  Marijuana was discovered in various places in the chief pumpman's room which Cash had been occupying for the last day and a half.

As a result of the search, Exxon requested that Cash take a drug test.  He refused.  By letter dated June 6, 1989, Exxon discharged Cash, stating that he had violated Exxon's Drug and Alcohol Policy by refusing to submit to a drug test after reasonable cause for testing had been determined.  The Union filed a grievance to protest Cash's discharge, and the dispute was eventually submitted to arbitration before an arbitration panel of three members, one appointed by Exxon, one by the Union, and the third a neutral arbitrator who acted as Chairman.

In an Opinion and Award dated November 27, 1992, the Chairman made the following factual findings:  A "very small" amount of marijuana or marijuana residue was found in the cabin used by Cash as of May 17, 1989.  This small amount was found in a number of places:  green leafy material in a desk and cabinet; ash on the rug near the bed; seeds under the rug; and cigarette

ends, or "roaches," in a pouch of a suitcase. App. at 91-92. No traces of drugs were found in the quarters Cash previously occupied. Cash was in the room in which marijuana was discovered for only one and a half days and for only a few hours daily during that period. A chief pumpman and another pumpman used the cabin before Cash moved into it, and other persons had access to the room because the door was left unlocked. Cash did not ask the utility men to clean his cabin because he did not want to interfere with their shore leave.

Despite the marijuana found in Cash's suitcase, the Chairman found "it is not reasonable to attribute, by clear and convincing evidence, ownership of the drug materials in the cabin to Mr. Cash." App. at 92. The Chairman noted that there were no drugs found in Cash's previous room and that it was unlikely that in his short time in the room he would have caused marijuana seeds to be under the carpet. Id. He also stated that "the cabin had not been cleaned at the time of the search, had been used by a number of persons in previous days, and was open to others." Id. The Chairman concluded that "[t]he circumstantial evidence certainly does not point to only the one logical conclusion that the material belonged to grievant," and therefore there was no "reasonable cause" under Coast Guard regulations to demand a drug test. App. at 92-93.

The Chairman next considered whether there was cause to test Cash under the company policy. He remarked that "[t]he matter of the suitcase is the weakest point of Mr. Cash's defense against the charge that he violated company policy by introducing

marijuana into his cabin." App. at 93. Cash had stated at one point that his wife had purchased the suitcase for him but testified at the arbitration that he had acquired the suitcase on a previous ship. The Chairman noted, however, that no doubt had been raised that the suitcase was used before Cash obtained it, and "[t]he undiscovered cigarette ends could have been in the pouch no matter how the bag was obtained." Id. He added that "[n]o inference can be drawn from the presence of the other marijuana in the searched room that grievant put the `roaches' in the bag." Id.

Finding the circumstantial evidence insufficient to prove that Cash possessed marijuana, the Chairman determined Cash could not be discharged for possession under a "just cause" standard. App. at 94. He concluded with the following passage:

> We must come to an ex post conclusion about whether there was cause to order a drug test. On May 17, 1989, in light of what Mr. Newman and his cohorts found, "cause" did exist. . . . The instant review of the findings concludes, however, that even though drug material was discovered in grievant's cabin, sufficient question was raised about ownership of the drugs so that "cause" "reasonable cause", "probable cause" or "just cause" did not exist to order a test. And Mr. Shearer's testimony established that Mr. Cash's appearance and actions provided no basis for ordering a test.
>
> The chairman concludes that if Mr. Cash had taken the demanded drug test and then had grieved, a later arbitration would have found that lack of "cause" "reasonable cause" "probable cause" or "just cause" to have ordered a test on the basis of what was found in the cabin would have led to reversal of any discipline based on test results. This analysis of the findings of the search shows that a test could not have been ordered on the basis of what was discovered in the cabin.

Id.

The Chairman did find, however, that Cash was insubordinate in refusing to take the test, saying he "violated the fundamental rule that . . . employees must first obey an order and then grieve." App. at 95. Nevertheless, "since the order to take the drug test arose out of an incorrect evaluation of the meaning of the marijuana found in Mr. Cash's cabin, discharge for failure to accept the test is not possible." Id. The Chairman ordered reinstatement with full seniority but without back pay.

The opinion was that of the Chairman of the Arbitration Panel. The Panel's award was issued by the neutral chairman and the Union appointed arbitrator who concurred with the award. The Company appointed arbitrator dissented.

Exxon filed suit in district court pursuant to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185, to vacate the arbitration award on the following two grounds: 1) that enforcement of the award would violate public policy; and 2) that the arbitration panel exceeded its authority by reinstating Cash. Both parties moved for summary judgment. The district court granted the Union's motion. The court found that because neither Exxon's policy nor the Coast Guard regulations mandate dismissal of an employee who refuses to submit to a reasonable cause test, Cash's reinstatement did not violate public policy. The court also found that the arbitrator acted within his authority in determining that cause did not exist to discharge Cash. Exxon timely filed a Notice of Appeal.

We have jurisdiction over the district court's grant of summary judgment under 28 U.S.C. § 1291.  Our review is plenary, and we apply the same standard the district court should have applied in reviewing the arbitration award.  Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters, 969 F.2d 1436, 1440–41 (3d Cir. ), cert. denied, ___ U.S. ___, 113 S. Ct. 660 (1992).

**II.**

In its argument that the trial court's order should be upheld, the Union emphasizes the favored treatment given arbitration awards in the courts.  The Supreme Court has frequently cautioned courts of the extremely limited role they play in reviewing the decision of an arbitrator.  See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987).  It has said that "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.  The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."  United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960).  Thus, we must enforce an arbitration award if it is based on an arguable interpretation of the collective bargaining agreement, and we may only vacate an award if it is entirely unsupported by the record or if it reflects a "manifest disregard" of the agreement.  News America Publications, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3rd Cir. 1990).

On the other hand, under an exception to the general rule, a court may vacate an award if it violates a "well defined

and dominant" public policy, discerned "'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"  W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)); United Trans. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 381 (3d Cir. 1995).  Application of the public policy exception requires a two step analysis.  The threshold question is whether a well defined and dominant public policy can be identified.  If so, the court must determine whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated the public policy.  Exxon relies on the public policy exception on this appeal, contending that in this case both questions should be answered in the affirmative.

## A.

Exxon argues that the arbitrator's reinstatement of Cash following his refusal to submit to a drug test was contrary to the well defined public policy against the operation of common carriers by individuals impaired by drugs or alcohol.  This court has twice recognized such a policy in cases involving Exxon seamen.  Exxon now asks us to complete a "trilogy" by finding that reinstatement of an employee in a safety-sensitive position who refuses to submit to a chemical test violates that public policy.

We first identified a broad public policy against permitting an individual to operate a vessel while under the influence of drugs or alcohol in Exxon Shipping Co. v. Exxon

Seamen's Union, 993 F.2d 357 (3d Cir. 1993) [hereinafter Exxon I], which arose after an Exxon oil tanker ran aground. Helmsman Morris Foster was among the crew given a drug and alcohol test under Coast Guard regulations and Exxon's Alcohol and Drug Use Policy. Exxon fired him on the basis of its drug policy when he tested positive for marijuana. The arbitrators decided that suspension was a more appropriate penalty than discharge, noting that there was insufficient evidence indicating that Foster had used drugs at work and that Foster had passed the Coast Guard drug screening level, which was higher than Exxon's. Id. at 359-60.

The district court vacated the award, and we affirmed, finding that the award requiring reinstatement violated "a 'well-defined and dominant' public policy against the operation of a vessel under the influence of drugs or alcohol" reflected in the Coast Guard regulation. Id. at 362 (quoting W.R. Grace, 461 U.S. at 766). We referred to one regulation requiring that individuals testing positive for drugs "shall be denied employment . . . or removed from duties which directly affect the safety of the vessel's navigation or operations," 46 C.F.R. §16.201(c) (1990), and another prohibiting those individuals from returning to work aboard a vessel unless rehabilitation is shown, id. § 16.370(d) (1990). 993 F.2d at 364. We concluded that the purpose of the Coast Guard regulations would be undermined and their deterrence function undercut by the reinstatement of Foster. Id.

We also noted that his reinstatement would be inconsistent with public policy as identified by other courts that had vacated arbitral awards reinstating operators of common carriers discharged for drug or alcohol use.  See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l, 861 F.2d 665 (11th Cir. 1988) (vacating arbitration award reinstating a pilot who flew a passenger airplane while under the influence of alcohol), cert. denied, 493 U.S. 871 (1989); Amalgamated Meat Cutters and Butcher Workmen v. Great Western Food Co., 712 F.2d 122 (5th Cir. 1983)(vacating award reinstating tractor-trailer driver after he overturned company truck while intoxicated).

In holding that the arbitrators' award requiring reinstatement would violate public policy we declined to accept the union's argument that the public policy exception to enforcing an arbitrators' award could only be applied when the award contravened a rule of positive law.  We found the broader test adopted by most of the circuits to be "the sounder approach," 993 F.2d at 363, and noted that "the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind the rules and prohibitions."  Id. at 364.  We thus held that the award reinstating Foster "violates the public policy protecting the public and the environment against operation of vessels by drug users."  Id.

We identified a similar public policy in Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189 (3d Cir. 1993) [hereinafter Exxon II].  Seaman Randall Fris was observed in an

impaired condition when he reported back one evening to the Exxon Long Beach tanker. He was discharged after a breathalyzer test disclosed a blood-alcohol level in violation of both the company's alcohol policy and Coast Guard regulations. The arbitration panel found that Fris had been intoxicated when he boarded the ship but concluded, over the dissent of the company representative, that in light of Fris' good record he should have been given an opportunity to demonstrate that his intoxication was an aberration. It thus reinstated Fris with a 90-day suspension. Once again the district court vacated the award, and we affirmed.

We held in Exxon II that there is a well defined and dominant public policy "that an owner or operator of an oil tanker should not be compelled to reinstate to a `safety-sensitive' position an individual who has been found to be intoxicated while on duty on that vessel." Id. at 1194. We noted that under Coast Guard regulations, a crew member who is intoxicated while on duty is guilty of a crime under 33 C.F.R. §95.055 (1993). Marine employers are prohibited from allowing an intoxicated individual to "stand watch or perform other duties," id. § 95.050(b), and must exercise "due diligence" to see that the regulations concerning intoxication are not violated, id. §95.050(a). 11 F.3d at 1194-95. We emphasized the potentially disastrous environmental consequences of an oil spill, and noted that statutes such as the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., evidence a Congressional policy of protecting the

environment against oil spills in waters under federal jurisdiction.  11 F.3d at 1194.  We also noted that Exxon faced potential civil and criminal liability if an impaired Exxon employee caused an accident.  Id. at 1195.  Consequently, we concluded that the federal policy favoring settlement of labor disputes by arbitration must yield to the "well defined and dominant policy that owners and operators of oil tankers should be permitted to discharge crew members who are found to be intoxicated while on duty."  Id. at 1196.

It is in light of our two previous Exxon cases that articulate a strong public policy against the operation of oil tankers and common carriers by crew members who are under the influence of drugs or alcohol that we turn to the somewhat different fact posture presented by this appeal.

**B.**

Exxon argues that reinstatement of an employee who refuses to submit to a drug test upon a showing of reasonable cause violates the public policy identified in Exxon I and Exxon II because it undermines enforcement of the Coast Guard regulations and other laws animated by that policy.  Exxon does not argue that Cash's refusal to take a drug test under these circumstances violated any positive law.  In both Exxon I and Exxon II we acknowledged that another court of appeals had held that an arbitration award could be overturned only when its enforcement would cause a violation of positive law, see Northwest Airlines, Inc. v. Air Line Pilots Ass'n Int'l, 808 F.2d 76, 83-84 (D.C. Cir. 1987), cert. denied, 486 U.S. 1014 (1988);

American Postal Workers Union v. United States Postal Serv., 789 F.2d 1, 8 (D.C. Cir. 1986), whereas others have opted for a broader approach that authorizes vacating an award that is "inconsistent with some significant public policy," E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n, 790 F.2d 611, 616 (7th Cir.)(quoting Robert A. Gorman, Basic Text on Labor Law 597 (1976)), cert. denied, 479 U.S. 853 (1986); see also United States postal Serv. v. American Postal Workers Union, 736 F.2d 822, 824 (1st Cir. 1984). In United Paperworkers International Union v. Misco, Inc., 484 U.S. 29 (1987), the Supreme Court considered the breadth of the public policy exception but declined to resolve this split.

In favoring the broader approach in Exxon I, we stated that "the distinction between an award which violates a manifestation of positive law and an award which is `inconsistent with public policy' is often blurred." 993 F.2d at 363. We reasoned that "[w]here the `positive law' is a stated purpose behind a statute or regulation, to thwart the purpose is to `violate positive law.'" Id. at 364. In Exxon II, we clarified that in the earlier case we had "expressly rejected" the argument that an arbitration award may only be set aside when its enforcement would violate a specific "positive law." Exxon II, 11 F.3d at 1192. Accord United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 381 (3d Cir. 1995).

The Union, although acknowledging that we opted for a broader reading of the public policy exception in Exxon I and II, argues that notwithstanding our broad language in those cases we

cited to and relied on positive law.  It notes that whereas reinstatement of the particular employees at issue in Exxon I and II would have violated specific Coast Guard regulations or placed Exxon in jeopardy of facing civil and criminal liability, there is no regulation or statute that punishes the refusal of an employee to submit to a drug test that is based on "reasonable cause."  It differentiates the Coast Guard regulations that apply to post-accident testing, where the refusal to submit "could subject the individual to suspension and revocation proceedings . . . and removal from any duties which directly affect the safety of the vessel's navigation or operations," 46 C.F.R. § 4.06-5(c) (1994), from those applicable to an employee who refuses to submit to reasonable cause drug testing, which only require the employer to enter the seaman's refusal in the vessel's official logbook, if such a book is required, id. § 16.250(d).  Thus, the Union contends the regulations do not manifest a public policy that would prevent reinstatement of an employee who refuses to submit to a reasonable cause drug test.

The district court relied on this distinction to find that reinstatement of such an employee would not violate public policy.  Exxon argues that in fact the Coast Guard regulations do provide the possibility of a more stringent sanction for refusal to undergo reasonable cause testing, but in our view of the issue we need not resolve that dispute.  To the extent that the district court held that the parameters of public policy were limited by the extent to which the Coast Guard regulations impose a penalty, it misconstrued our holdings in Exxon I and II.  In

fact, in Exxon I, Foster's drug test was negative when evaluated at the Coast Guard screening level, and thus Coast Guard regulations did not require that his license be revoked. 993 F.2d at 358, 361. Nevertheless, we found that his reinstatement would violate the public policy underlying those regulations. Id. at 364.

A clearly defined and cautiously administered program of drug testing, whether based on random testing or reasonable cause, is the natural corollary to our earlier opinions identifying a strong public policy that precludes allowing intoxicated or drug-impaired seamen to remain in safety-sensitive positions aboard oil tankers. We noted in Exxon II that "the statutes and regulations . . . convey the unequivocal message that . . . an owner or operator [of an oil tanker] should take every practicable step to ensure that an intoxicated crew member does not cause or contribute to an oil spill." 11 F.3d at 1195. The right to test employees for alcohol or drug use upon a showing of reasonable cause, on threat of discharge, is critical to achieving the objective of the Coast Guard regulations and of the environmental protection statutes we have cited. Were employees permitted to refuse to submit to such chemical tests, it is difficult to imagine why any drug user would consent.

The federal government has manifested its strong support for drug testing of employees involved in mass transportation through the promulgation by all federal agencies governing mass transportation of regulations designed to prevent drug use by employees in safety-sensitive positions. Such

regulations in most instances equate refusal to test with a "positive" test result.  See, e.g., 14 C.F.R. §121.455(c)(1995)(Federal Aviation Administration); 49 C.F.R. § §219.213, 219.505, 219.603(b) & (c) (1994)(Federal Railroad Administration); 49 C.F.R. § 391.95(d) (1994)(Federal Highway Administration); 49 C.F.R. § 653.35(a)(1994) (Federal Transit Administration); 10 C.F.R. § 26.27(c)(1994) (Nuclear Regulatory Commission).

The force of our decisions in Exxon I and II would be radically undermined if we declined to take the logical next step and decide that reinstatement of an employee who refused to submit to a drug test upon a showing of reasonable cause violates public policy.  Although Coast Guard regulations do not mandate discharge for an employee – even one in a safety-sensitive position – who refuses a drug test, we conclude that if Exxon had cause to require a test, Cash's reinstatement following his refusal would violate public policy because it would undercut enforcement of Coast Guard regulations and environmental statutes which denote a well defined and dominant public policy against permitting intoxicated crew members to operate oil tankers and other common carriers.  Cf. Local No. P-1236, Amalgamated Meat Cutters & Butcher Workmen v. Jones Dairy Farm, 680 F.2d 1142, 1145 (7th Cir. 1982)(company rule forbidding employees from reporting health violations violated public policy because it hindered accomplishment of the goals of the Meat Inspection Act).

C.

Exxon recognized that under its collective bargaining agreement, the Union was entitled to grieve whether there was reasonable cause to require Cash to submit to a drug test. The Chairman found that Exxon lacked "cause" to require Cash to submit to a drug test, but that Cash was "insubordinate" for refusing to take the test. However, because discharge for insubordination was not mandated by the company policy, the Chairman determined that discharge was too harsh a sanction, and the panel ordered Cash reinstated without back pay.

In considering Exxon's challenge to the arbitral award, we do not review for legal error, but are limited to assessing whether the award "draw[s] its essence from the collective bargaining agreement." W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983). This standard is satisfied "'if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.'" Super Tire Engineering Co. v. Teamsters Local Union No. 676, 721 F.2d 121, 124 (3d Cir. 1983) (quoting Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969)), cert. denied, 469 U.S. 817 (1984). See also News America Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990)("A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract or because it believes its

interpretation of the contract is better than that of the arbitrator." (citation omitted)).

Exxon argues that we should set aside the award because the arbitrator exceeded his authority in reinstating Cash to his former position.  In reviewing Exxon's multi-faceted challenge to the arbitral decision we may not "second-guess[] the arbitrator's fact-finding, particularly insofar as the conclusion that the asserted public policy would be violated by the employee's reinstatement depends on drawing factual inferences not made by the arbitrator."  United States Postal Service v. National Ass'n of Letter Carriers, 839 F.2d 146, 148 (3d Cir. 1988).

## 1.  The Cause Requirement

Exxon argues that in interpreting the company drug policy's requirement that "cause" support a drug test, the Chairman impermissibly inserted a "clear and convincing" evidence of ownership standard, and employed an "ex post" analysis to assess whether cause existed.  The Union responds that the quantum of proof required in such cases is unsettled, but that where the offense charged is one that is punishable by law, such as drug possession, arbitrators have commonly held employers to a "clear and convincing" or "beyond a reasonable doubt standard."  Brief of Appellee at 35 (citing Frank Elkouri & Edna Asper Elkouri, How Arbitration Works  661-63 (4th ed. 1985)).  It further maintains that neither the parties' contract nor the company's Drug and Alcohol Policy defined "cause," identified a standard of proof to be employed, or specified at what point in

time "cause" must exist; therefore, these determinations were within the province of the arbitrator.

We agree. The parties bargained for an arbitrator to interpret their contract. The Exxon Drug and Alcohol Policy states: "[t]he Company . . . has the right to require employees to submit to medical evaluation or alcohol and drug testing <u>where cause exists</u> to suspect alcohol or drug misuse." App. at 44 (emphasis added). The term "cause" is ambiguous. Where a contractual ambiguity exists it is within the province of the arbitrator to interpret the ambiguous phrase. <u>Suburban Transit Corp.</u>, 51 F.3d at 380-81. Although the Chairman's opinion may not be a model of clarity, it is evident that he ultimately concluded that Exxon lacked "cause" to require Cash to submit to a drug test. That Exxon now disagrees with that conclusion is not a ground for vacating his decision. Exxon could have defined "cause" more specifically in its policy, or could have bargained with the union to remove cases arising under its drug policy from the jurisdiction of arbitrators altogether. It did not, and therefore may not now be heard to complain that the arbitrator lacked authority to make determinations that the company policy and the parties' agreement left open for an arbitrator's judgment.

### 2. <u>Change of Discipline</u>

Exxon next argues that the arbitrator lacked authority to reinstate Cash because the company's September 28, 1988 letter clearly notified employees that termination was the penalty for violation of the Drug and Alcohol Policy. But the Drug Policy

requires only that employees submit to testing "where cause exists."  The arbitrator concluded that it did not; accordingly, based on his findings, the arbitrator did not exceed his authority.

Exxon further maintains that the arbitrator lacked authority to change the discipline for a finding of insubordination, and in doing so exceeded his power to interpret the contract.  The arbitrator found that Cash's refusal to take the drug test was insubordinate.  Although company rules permit Exxon to discharge an employee for insubordination, the arbitrator believed that under these circumstances a discharge would conflict with the requirement that "cause" support an order to take a drug test.

This situation is analogous to the one we faced in Super Tire, 721 F.2d 121.  In that case, drinking alcohol during work hours was characterized in the parties' contract as a cause for "immediate dismissal."  Id. at 122.  Yet dismissal also required "just cause."  Id.  The arbitrator determined that although the employee had been drinking during work hours, dismissal was too harsh a punishment because the employee had not been warned that the company would strictly enforce its policy. We reversed the district court's order vacating the arbitrator's determination because we concluded that the terms of the contract were not so clear as to foreclose the arbitrator's interpretation that a warning was required.  Id. at 125.

In Super Tire, we relied on our earlier decision in Arco-Polymers, Inc. v. Local 8-74, 671 F.2d 752 (3d. Cir.), cert.

denied, 459 U.S. 828 (1982).  There, a clause in the employment contract provided for discharge of employees absent from work for four consecutive days without good cause.  Another section provided that employees shall be discharged only for "just cause."  Id. at 753.  The arbitrator reinstated an employee who had been terminated for being absent from work for 19 days without good cause.  The district court vacated the award.  We held that the district court erred because "[i]t cannot be said with absolute certainty . . . that discharge under this section is `strictly a function of management.'"  Id. at 756 (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584 (1960)).

Similarly here, the Agreement stated that insubordination "shall constitute cause for which unlicensed personnel may be discharged."  App. at 147 (emphasis added).  The subsequent September 1988 letter warned that the company's Drug and Alcohol Policy would be strictly enforced.  The policy included the provision that employees must submit to drug testing "where cause exists."  App. at 44.  The Chairman found that reading these provisions together, the "just cause" standard still applied, and because Exxon lacked cause to test Cash, discharge for insubordination would be inappropriate.  As in Super Tire and Arco, we cannot say that the arbitrator's reading of the contract is implausible and that his decision to reinstate Cash was beyond the bounds of his authority.

### 3.  Interpretation of Coast Guard Regulations

Exxon also contends that the arbitrator exceeded his authority by interpreting Coast Guard regulations, because an arbitrator's decision must be based exclusively on the collective bargaining agreement. In light of the fact that the Chairman based his decision on the terms of the collective bargaining agreement, even though he referred to the Coast Guard regulations, see App. at 93, we have no occasion to consider whether, as Exxon claims, the Chairman interpreted the regulations incorrectly.

### 4. <u>Reasonableness of Arbitrator's Findings</u>

Finally, we consider whether the Chairman's finding in this case that Exxon lacked "cause" to order Cash to take a drug test was so unreasonable that it would violate public policy to enforce his award. The Chairman found that there was marijuana or marijuana residue in numerous places in the cabin Cash was using. Specifically, there was green leafy material in a desk and cabinet, ash on the rug, seeds under the rug, and two butts of marijuana, referred to as "roaches," in a suitcase pouch. The Union emphasized Cash's minimal association with that room, in that Cash had been assigned there less than two days before and had spent only a few hours there because he was working long shifts elsewhere on the ship.

At oral argument, Exxon argued that where, as here, a matter of public policy is involved, the arbitrator's findings should be held to a higher standard of scrutiny and set aside if unreasonable. We find no authority for vacating an arbitral award on such grounds. On the contrary, an arbitrator's decision

need be neither wise nor internally consistent.  In fact, arbitrators have no obligation to explain their reasons for an award or even to write an opinion unless the contract so requires.  Virgin Islands Nursing Association's Bargaining Unit v. Schneider, 668 F.2d 221 (3d Cir. 1981); see also United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598 (1960).  Arbitrators' decisions are subject to a standard of only "minimal rationality."  Virgin Islands Nursing, 668 F.2d at 223 (quoting Robert A. Gorman, Basic Text on Labor Law 586 (1976)).  Although we will vacate an award if we find that the award itself violates public policy, the public policy exception does not lessen our deference to an arbitrator's factual findings.

The Supreme Court has made clear that findings of fact and inferences to be drawn therefrom are the exclusive province of the arbitrator.  United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36, 44 (1987).  That a court "is inquiring into a possible violation of public policy [does not] excuse a court for doing the arbitrator's task."  Id. at 45.  Thus, this court may not refuse enforcement even if we consider the evidence sufficient to prove that reasonable cause existed to require Cash to submit to a drug test.  Exxon challenges the reasonableness of the arbitrator's conclusions, but "[n]o dishonesty is alleged; only improvident, even silly, factfinding is claimed." Id. at 39.

It is not our role to draw inferences that the factfinder did not.  We therefore will not disturb the arbitrator's finding that "cause" did not exist to require Cash to submit to a drug test.  Accordingly, because we accept the

arbitrator's finding that Cash was ordered to submit to a test without reasonable cause, his reinstatement does not offend public policy and the decision of the arbitrator must be enforced.

## III.

For the foregoing reasons, the order of the district court will be affirmed.

---

[298] Hon. Marjorie O. Rendell, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.