

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-14-2004

# Citgo Asphalt v. Local 2-991

Precedential or Non-Precedential: Precedential

Docket No. 03-1503

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Citgo Asphalt v. Local 2-991" (2004). *2004 Decisions.* Paper 170.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

———————

Nos: 03-1503

———————

CITGO ASPHALT REFINING
COMPANY,
Appellant

v.

THE PAPER, ALLIED-INDUSTRIAL,
CHEMICAL, AND ENERGY WORKERS
INTERNATIONAL UNION LOCAL NO.
2-991

———————

On Appeal from the Order of the United
States District
Court for the District of New Jersey
(Civil Action No. 02-CV-00864)
District Judge: Hon. Joseph E. Irenas

———————

Argued December 18, 2003

Before: ROTH and McKee, Circuit
Judges,
and CUDAHY, Senior Circuit Judge[*]

———————

[*]The Hon. Richard D. Cudahy, Senior
Circuit Judge of the United States Court of

Opinion Filed: October 14, 2004

———————

Ronald H. DeMaria, Esquire
(ARGUED)
McElroy, Deutsch, Mulvaney, LLP
1300 Mt. Kemble Avenue
Morristown, New Jersey 07962

James J. McGovern III, Esq.
Genova, Burns & Vernoia
354 Eisenhower Parkway
Plaza II, Suite 2575
Livingston, NJ 07039

Attorneys for Appellant

Robert F. Henninger, Esquire
(ARGUED)
Warren J. Borish
Spear, Wilderman, Borish, Endy, Spear
and Runckel
36 Tanner Street, 2nd Floor
Haddonfield, New Jersey 08033

Attorneys for Appellee

OPINION

McKEE, Circuit Judge.

CITGO Asphalt Refining Company
appeals the district court's confirmation of
a labor arbitrator's decision that CITGO's
zero tolerance drug abuse policy is
unreasonable. For the reasons that follow,
we will reverse.

———————

Appeals for the Seventh Circuit, sitting by
designation.

## I. FACTS

CITGO Asphalt Refining Company ("CARCO") is a New Jersey partnership involved in the oil refining industry. CITGO Petroleum Corporation ("CITGO"), is the majority partner of CARCO. In December 1998, CITGO announced that it was going to implement a new uniform national substance abuse policy, which included a zero tolerance policy (the "policy"), at all of its petroleum refining facilities in the nation. The policy was thereafter implemented at more than sixty locations. Local 3-0673 of the Paper, Allied-Industrial, Chemical and Energy Workers International Union ("PACE") challenged the policy after it was implemented at CARCO's asphalt plant in Savannah, and the challenge proceeded to arbitration. The arbitrator ruled that the policy was proper, valid and reasonable in all respects, and issued an opinion and award denying the Union grievance in its entirety. The policy was also challenged at CARCO's asphalt plant in Paulsboro, New Jersey, where the hourly workers are represented by PACE Local 2-991. There, Local 2-991 argued that the new zero tolerance policy changed the existing policy as follows:

> (1). . . .Under the old policy, urine tests for drugs were given during the annual physical, with the individuals to be given their physical exams and receiving a written questionnaire a week or two before the physical notifying them that they were going to be scheduled for their physical and requiring them to respond to the questionnaires. They were given one or two days advance notice of the annual physical after they had completed the questionnaire. Other than this drug testing as part of the annual physical, there was not random testing. Under the new policy, random testing is done immediately after receiving notice.

> (2). Under the old policy, off-duty conduct could not be a violation, but it is . . . under the new policy.

> (3). [Under the old policy] [C]ause, suspicion or technical performance problems or occurrence of an accident or incident or safety violation could trigger a drug test as part of the annual physical. Under the new policy, drug testing can be done without any of these prerequisites.

> (4). Under the old policy, employees who tested positive during an annual

2

physical were given an opportunity for rehabilitation, i.e., a second chance. But, under the new policy, no employee is given a second-chance opportunity unless they come forward and admit their drug use prior to any positive drug test, called "self-acknowledgment."

Local 2-991's Br. at 9-10.

Local 2-991 challenged the new policy by filing two grievances. One alleged an "Improper implementation of a 'new' drug and alcohol policy." That grievance claimed that CARCO violated the controlling collective bargaining agreement ("CBA") by not bargaining over the new policy,[1] and that the policy violated a provision of the CBA dealing with future bargaining. The other grievance alleged that the "Company implemented a drug and alcohol policy

that is totally unreasonable."

The grievances proceeded to arbitration after the parties agreed upon the following submission:

> Did CITGO violate Article XXX of the Labor Agreement by improperly implementing its National Substance Abuse Policy at the Paulsboro facility on October 1, 1999. If not, was the policy unreasonable?

At the arbitration hearing, the parties stipulated that the Management Rights Clause (Article III) and the Future Bargaining Clause (Article XXX) in the then current CBA were identical to those contained in every CBA that had been in effect at Paulsboro since 1977. Article III, the Management Rights Clause provides, in applicable part, as follows:

> Except to the extent expressly abridged by an express and specific provision of this Agreement, the Company reserves and retains all of its Common Law or other rights to manage the business as such rights existed prior to the execution of this or any other previous Agreement with the Union or any other

---

[1] The collective bargaining relationship between the parties began at Paulsboro in the mid-1970s. The first labor contract at Paulsboro was negotiated in 1997. CITGO bought the facility in 1991 and continued both the bargaining relationship and the CBA. The Paulsboro facility became a refinery in the late 1970s and is engaged in the processing of crude oil into asphalt and other products. There were some 56 bargaining unit members when the grievances were filed.

3

Union. The rights of management which are not abridged by this Agreement, shall include, but are not limited to: . . . make and enforce rules for the maintenance of discipline and safety, and to suspend, discharge, or otherwise discipline employees for just cause. The listing of specific rights in this Agreement is not intended to be nor shall it be restrictive of or a waiver of any of the rights of management not listed and specifically surrendered herein, whether or not such rights have been exercised by the Company in the past.

Article XXV of the CBA, entitled: "Grievance Procedure and Arbitration," provides, in relevant part, as follows:

25.1. Grievances are defined as alleged violations of express and specific provisions of this Agreement occurring during the term of this Agreement or any renewal or extension thereof. . . . Neither the Union nor an employee shall use or attempt to use the grievance procedure as a means of changing, amending, modifying, supplementing or otherwise altering in any respect whatsoever this Agreement or any part thereof.

**********

25.4. The Union and the Company both agree that the submission to the arbitrator shall be based on the original written grievance submitted in the grievance procedure. . . .

**********

25.6. The power and authority of the arbitrator shall be strictly limited to determining the meaning and interpretation of the explicit terms of this Agreement as herein expressly set forth. The arbitrator shall not have authority to add or to subtract from or modify any of said terms, or to limit or impair any Common Law or other right of the Company, or to establish or change any wage or rate of pay. ... The parties agree that the power and jurisdiction of any

4

arbitrator chosen hereunder shall be limited to deciding whether there has been a violation of a provision of this Agreement. The arbitrator shall not substitute his judgment for that of the Company in the absence of a clear abuse of discretion. The arbitrator shall not be empowered, and shall have no jurisdiction, to base his Award on any alleged practices or oral understandings which are not incorporated in writing in this Agreement. . . .

Article XXX, the Future Bargaining Clause, provides:

> The parties acknowledge that, during the negotiations which resulted in this Agreement and any attachments hereto, each had the unlimited right and opportunity to make demands and proposals with respect to any subject . . . not removed from the area of collective bargaining . . .and therefore each waives the right to further bargaining on any subject not covered or covered under this Agreement and

any attachments hereto during the term hereof.

The parties also stipulated that:

(1). The Paulsboro refinery is a hazardous work environment that can explode and poses a potential threat to workers, the environment, and to the public at large.

(2). The bargaining unit positions affected by the drug testing policy are safety sensitive (as defined in [Department of Transportation] regulations).

(3). The duties of the bargaining unit employees are such that their attempts to perform while in a state of drug impairment may pose a threat to co-workers, to the workplace, to the environment, and to the public at large.

(4). All employees (management and bargaining unit employees alike) at Paulsboro play a critical role in both

5

preventing accidents and minimizing the effects of accidents.

(5). The speed in responding to a dangerous condition is critical to limiting potential damage and injury.

In addition, Owen Haynes, a CARCO employee for 30 years and Local 2-991 President for approximately 12 years, testified that Paulsboro is a "potentially dangerous work environment," and Mike Drager, the manager of the Paulsboro facility, testified about "toxic and deadly" gases at the refinery.

CITGO contends that the only evidence Local 2-991 offered to support its grievance that the Policy was unreasonable was the testimony of Eric Hamilton, the president of the PACE local at a company called "Motiva," and the testimony of Timothy Koladi, the chairman of the union grievance committee at Sun Oil. Both men testified that the substance abuse policies at their respective facilities included random drug testing. They also testified that the Motiva and Sun Oil policies are virtually identical to the CITGO policy except for CITGO's zero tolerance provision.

Hamilton testified as follows regarding the policy at Motiva:

(1). There are 384 people in the bargaining unit and only two people have ever been disciplined in two years.

(2). Motiva never requested a zero tolerance program.

(3). Motiva's safety record, unlike CITGO's, is just "industry standard."

(4). Motiva, like CITGO, needed a standardized policy, company-wide.

(5). The policy was adopted by "consensus," not through negotiations.

(6). Both employees disciplined under Motiva's policy were "repeat offenders." Both violated the policy a second time after not being disciplined for an initial violation, and both were detected by random testing.

As to the policy at Sun, Oil, Koladi testified:

(1). There are 525

6

employees in one bargaining unit and 550 employees in the other.

(2). That in the ten years since 1990, only four to six employees have been disciplined under the policy and they too were all second offenders, after having been given a "first chance" without discipline.

John DeLeon, CITGO's Manager of Human Resources and Labor Relations, testified in defense of CITGO's Policy and explained the steps CITGO took in designing its national substance abuse policy. DeLeon testified that CITGO reviewed the practices of other companies in the industry and patterned much of its policy after the Omnibus Transportation Employee Testing Act of 1991, 49 U.S.C. § 31306 *et seq.* DeLeon also explained that, because a uniform policy was needed, all aspects of the program including random testing, zero tolerance, etc. apply to all employees, from the president of CITGO down. He further explained that the policy was implemented nationwide, including all facilities where there was union representation, and that he did not know of a major refinery that did not have random testing. According to DeLeon, Tosco, Marathon and Exxon, three major companies in the industry, also had zero tolerance substance abuse polices. DeLeon's testimony was unrebutted.

During his testimony, DeLeon gave specific reasons for a zero tolerance provision. He testified that CITGO's safety record is the best in the industry, a fact not challenged by Local 2-991, and that CITGO wanted to maintain its record. He explained that, in CITGO's judgment, offering a second chance "sends a message to employees that it's okay to do drugs until you get caught. . . . [T]hat was a very strong feeling, . . . ." DeLeon also explained that the zero tolerance policy does not apply if an employee comes forward and identifies him/herself as a person with a substance abuse problem. He also explained that CITGO's medical director was on the team that designed the program, and added that the only union in the country that had challenged the program was the union at the Savannah, Georgia, asphalt plant. As noted, the Savannah arbitration resulted in an award which found that the CITGO Policy was reasonable in all respects. The president of Local 2-991 testified that the Savannah plant is virtually identical to the Paulsboro facility.

The arbitrator found "no contractual breach by [CITGO] with respect to its unilateral adoption and implementation of a substance abuse program in 1999." He also found that the mandatory, random testing procedure was both proper and reasonable. However, he sustained the local's challenge to the zero tolerance policy. The arbitrator ruled that part of the Policy was unreasonable. He explained:

[T]here can be no serious

quarrel with the right of a company in this type of industry to make certain that safety concerns are paramount and should be adequately addressed. . . . Indeed, it was recited that CITGO has the best safety record in the industry and wants to keep it that way. I therefore will not seek to disturb that record. However, there are specific areas of the Policy that are troubling to me. . . .

While the Union argued that mandatory random testing should be declared unreasonable, the Arbitrator cannot agree with that position. Having said that, I do nevertheless understand and appreciate the Union's argument with respect to employees who test positive as the result of random testing not being given a second chance under the Policy. The facts reveal that this is contrary to the policies in place at the Motiva refinery in Delaware City, Delaware, and at the Sun refinery in Marcus Hook. While the Arbitrator fully acknowledges that the best safety record in the industry is obviously a

legitimate objective for any company, it has not been shown to my satisfaction that permitting an employee to have a "second chance" would be inconsistent with that goal. That being so, the Arbitrator agrees with the Union that the Policy, without giving a second chance for rehabilitation, is unreasonable to that extent and to that extent only. This is especially so where the DOT regulations permit second chance or rehabilitation opportunities. I therefore find that the Policy should be modified in that regard.

Thus, "[t]he arbitrator . . . sustained [the policy] as written except where it does not permit a (sic) employee second-chance or rehabilitation opportunities." App. at 473. The arbitrator held that the policy (including CARCO's right to conduct random drug testing), was reasonable, except for the so-called "zero tolerance" provision. . . .

## II. DISTRICT COURT PROCEEDINGS

CARCO filed a complaint in the district court challenging the arbitration

8

opinion and award.[2] CARCO alleged that the arbitrator: (1) exceeded the power and authority given to him by the parties; (2) rendered an award which did not draw its essence from the labor agreement; (3) ignored the plain language imposing limitations on his authority; (4) rendered an award which was not totally supported by the record; and (5) failed to apply the standard of review set forth in the CBA. Local 2-991 filed an answer and counterclaim to enforce the award in its entirety. In time, cross-motions for summary judgment were filed and the district court thereafter entered an order granting Local 2-991's motion for confirmation of the award in its entirety. This appeal followed. The arbitrator's rejection of the zero tolerance provision of the policy is the only issue on appeal.

## III. STANDARD OF REVIEW

We exercise plenary review of the district court's confirmation of a labor arbitration award and apply the same standard the district court should have applied. *Exxon Shipping Co. v. Exxon Seaman's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996) ("*Exxon III*").

Courts play a very limited role in reviewing the decision of an arbitrator appointed pursuant to a collective bargaining agreement. *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). "When the parties include an arbitration clause in their [CBA], they choose to have disputes concerning constructions of the contract resolved by an arbitrator." *W.R. Grace and Co. v. Local Union 759, International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America*, 461 U.S. 757, 764 (1983). Consequently, we "are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Union v. Misco, Inc.*, 484 U.S. at 36. This follows from the fact that the arbitrator's judgment was bargained for by the parties. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 568 (1960). "Full-blown judicial review of labor arbitrators' decisions would annul the bargain of the parties for an arbitrator's construction of their [CBA]" and replace it with the court's construction. *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436, 1441 (3d Cir. 1992) (citing *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 599

---

[2]The district court had subject matter jurisdiction pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), which provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy . . . ."

(1960)).

Therefore, we do not review an arbitrator's award for legal error. *Exxon III*, 73 F.3d at 1295. "[A]s long as the arbitrator's award draws its essence from the [CBA] and is not merely [the arbitrator's] own brand of industrial justice, the award is legitimate." *Misco*, 484 U.S. at 370 (citation and internal quotations omitted). "[O]nly where there is a manifest disregard of the agreement, totally unsupported by the principles of contract construction and the law of the shop, may a reviewing court disturb the award." *Exxon III*, 73 F.3d at 1295 (citations and internal quotations omitted). Accordingly, the award stands "even if the court finds the basis for it to be ambiguous or disagrees with its conclusions under the law." *Stroehman Bakeries, Inc., v. Local 776*, 969 F.2d at 1441 (citation omitted).

Therefore, a court can only vacate an arbitrator's award "if it is entirely unsupported by the record or if it reflects a manifest disregard of the agreement." *Exxon III*, 73 F.3d at 1291 (citation and internal quotations omitted). "An arbitrator's decision need be neither wise nor internally consistent." *Id.* at 1297. The decision is "subject to a standard of only minimal rationality." *Id.*

It follows that a reviewing court must defer to the arbitrator's factual findings. *Id.* "[F]indings of fact and inferences to be drawn therefrom are the exclusive province of the arbitrator." *Id.* (citing *Misco*, 484 U.S. at 36). It is not the court's "role to draw inferences that the factfinder did not." *Id.*

Nevertheless, "[a]n arbitrator has the authority to decide only the issues actually submitted." *Matteson v. Ryder System Inc.*, 99 F.3d 108, 112 (3d Cir. 1996) (citation omitted). "It is the responsibility of the arbitrator in the first instance to interpret the scope of the parties' submission, but it is within the courts' province to review an arbitrator's interpretation." *Id.* at 113 (citation omitted). Although our review of an arbitration award is "highly deferential[,]" *id.* we do not "simply . . . rubber stamp [arbitrators'] interpretations and decisions . . . ." *Id.* (citation and internal quotations omitted).

## IV. DISCUSSION

As noted above, the only issue before us is the propriety of the arbitrator's determination that CITGO's zero tolerance policy is unreasonable. CITGO makes two separate, yet closely related, arguments in support of its challenge to that portion of the arbitrator's determination. First, CITGO contends that the arbitrator acted outside the scope of his authority and rendered an award that did not draw its essence from the CBA. Second, it contends that the arbitrator's determination that the zero tolerance policy is unreasonable is not supported by the record. We will address each contention in turn.

**A. The arbitrator acted outside the scope of his delegated**

**authority and rendered an award that**

10

**did not draw**

**its essence from the collective bargaining agreement.**

The arbitrator made three separate findings. He agreed that there can be no "serious quarrel" with CITGO's right to "make certain that safety concerns are paramount and . . . adequately addressed." Second, he agreed that CITGO did have the best safety record in the industry and "wants to keep it that way."[3] Third, he agreed that having the best safety record in the industry "is obviously a legitimate objective for any company." Notwithstanding this, he stated: "It has not been shown to my satisfaction that permitting an employee to have a 'second chance' would be inconsistent with [having the best safety record in the industry]." He concluded his analysis with: "[T]hat being so the arbitrator agrees with the Union that the policy, without giving a second chance for rehabilitation is unreasonable."

However, in finding that the absence of a second chance was unreasonable, the arbitrator ignored the parameters of his inquiry as defined in the CBA. As we noted above, Article XXV, § 25.6 of the CBA provides, in relevant part, that "[t]he arbitrator shall not substitute his judgment for that of the Company in the absence of a clear abuse of discretion."[4] The arbitrator could therefore only conclude that the zero tolerance policy was unreasonable if he found that CITGO clearly abused its discretion in instituting it. However, the arbitrator found no abuse of discretion, and this record supports none. The arbitrator found that the zero tolerance policy was unreasonable simply because *he did not believe* that giving an employee a second chance was inconsistent with CITGO's goal of having the best safety record in the industry. He wrote: "[I]t has not been shown to my satisfaction that permitting an employee to have a 'second chance' would be inconsistent with that goal." Thus, rather than concluding that CITGO abused its discretion in adopting a zero tolerance policy, the arbitrator simply substituted his own judgment for CITGO's, and declared CITGO's zero tolerance provision unreasonable.

However, an arbitrator's opinion and award based on "general considerations of fairness and equity" as opposed to the exact terms of the CBA, fails to derive its essence from the CBA. *MidMichigan Reg'l Med. Ctr – Clare v. Professional Employees Div.*, 183 F.3d 497, 502 (6th Cir. 1999). As we explain more fully below, the award here comported with the arbitrator's view of fairness, but did not draw its essence from the CBA.

---

[3] As noted, the arbitrator added that he would therefore not "seek to disturb that record."

[4] According to CITGO, this "is a very unusual provision to have in a labor agreement." CITGO's Br. at 23.

11

Local 2-991 defends the arbitrator's conclusion by arguing that the parties' submission allowed the arbitrator to go beyond the § 25.6 "abuse of discretion" standard. We agree that, although the CBA is the "sole source of the arbitrator's authority[,] . . . [t]he parties may . . . agree to allow an arbitrator to go beyond the express terms" of the CBA. *High Concrete Structures, Inc. v. United Electrical, Radio and Machine Workers of America, Local 166*, 879 F.2d 1215, 1218 (3d Cir. 1989) (citation omitted). "They may do so either by providing in the collective bargaining agreement for interest arbitration as well as rights arbitration,[5] *or by agreeing, separately, to submit specific issues to arbitration.*" *Id.* (emphasis added). A submission may be "express, may incorporate an antecedent grievance, or may be based on other relevant submissions or actions." *Id.* at 1219 (citations omitted). "But however derived, *the terms of the submission may empower the arbitrator to resolve disputes*

*that go beyond the four corners of a collective bargaining agreement.*" *Id.* (citations omitted) (emphasis added).

As recited earlier, the agreed-upon submission read:

> Did CITGO violate Article XXX of the Labor Agreement by improperly implementing its National Substance Abuse Policy at the Paulsboro facility on October 1, 1999. If not, was the policy unreasonable?

As Local 2-991 sees it, even if the language of the CBA prohibited the arbitrator from substituting his own judgment for that of CITGO's absent an abuse of discretion by CITGO, it is the language of the parties' submission that controls the extent of the arbitrator's authority. Therefore, argues Local 2-991, because the submission required that the arbitrator determine, in the event that he found that the policy did not violate Article XXX (the Future Bargaining Clause) of the CBA, whether the policy was reasonable, the submission freed the arbitrator from the confines of that portion of the CBA that prohibited the arbitrator from substituting his own judgment for CITGO's absent an abuse of discretion by CITGO. More succinctly, Local 2-991 argues that the broad language of the last sentence of the submission trumped the narrower language of § 25.6 of the CBA.

---

[5]In "interest arbitration," the parties ask the arbitrator to set new terms and conditions of employment, while in "rights arbitration," the arbitrator is asked to resolve disputes involving the interpretation or application of terms and conditions of employment already agreed to in the CBA. *Local 801, Int'l Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, ALF-CIO v. Pennsylvania Shipbuilding Co.*, 835 F.2d 1045, 1046-47 (3d Cir. 1987).

12

According to Local 2-991, the arbitrator merely

> reviewed the terms of the CBA, listened to the witnesses' testimony, reviewed the terms of documents submitted, and considered attorney argument. After digesting all of this evidence, [the arbitrator] addressed the stipulated issue and found that there was no contract violation. Which brought the arbitrator to the next question placed before him by the parties: whether the policy was unreasonable. The arbitrator answered that question and found the "zero tolerance" portion of the policy unreasonable. [Thus, according to the union,] [u]nder the circumstances, there can be no doubt that the award is enforceable.

Local 2-991's Br. at 23.

However, assuming *arguendo* that the submission trumped the "abuse of discretion" standard in the CBA, it is nevertheless still apparent that Local 2-991 has only described what the arbitrator did. The union has not explained either the rationale for, or the basis of, the

arbitrator's conclusion. [6] That failure leads to CITGO's second argument.

## B. The arbitrator's decision that the zero tolerance policy

### is unreasonable is not supported by the record.

As recited earlier, "[a]n arbitrator's award must be enforced so long as it draws its essence from the collective bargaining agreement." *United Industrial Workers v. Government of the Virgin Islands*, 987 F.2d 162, 170 (3d Cir. 1993) (citation and internal quotations omitted). "A labor arbitration decision fails to draw its essence from the collective bargaining agreement if the arbitrator acted in manifest disregard of the law, *or if the record before the arbitrator reveals no support for the arbitrator's determination.*" *Id.* (citation omitted) (emphasis added). CITGO argues that,

---

[6]Local 2-991's argument seems to establish no standard by which to judge the propriety of the arbitrator's decision. Once the CBA's "abuse of discretion" standard is jettisoned, the union's argument would allow the arbitrator to apply any free-floating standard including his/her own subjective judgment whether or not it was supported by the record. This gives the arbitrator almost unfettered discretion to determine the reasonableness of a challenged policy. The union claims that the last sentence of the submission did just that.

regardless of the scope of the last sentence of the submission, the award must still be supported by the record, and this award is not. We agree.[7]

The arbitrator relied only on two "facts" to support his determination that the zero tolerance policy was unreasonable. First, the arbitrator noted that neither Motiva nor Sun Oil have zero tolerance policies at their refineries. However, the fact that two companies with safety records that are inferior to CITGO's do not have zero tolerance policies does not establish that CITGO acted unreasonably in adopting a zero tolerance policy. In fact, considering the stipulated catastrophic repercussions of a safety lapse at the Paulsboro plant, and CITGO's superior safety record, one could just as readily conclude that it was unreasonable for Sun Oil and Motiva not to have a zero tolerance policy. Moreover, the arbitrator's finding of the unreasonableness of the zero tolerance policy completely ignores DeLeon's unrebutted testimony that the three largest companies in the industry – Exxon, Marathon and Tosco – have zero tolerance policies exactly like CITGO's. The undisputed fact that the three largest companies in the industry have zero tolerance policies certainly casts doubt upon the arbitrator's focus on Motiva and Sun Oil, and the arbitrator never explained why he elevated the importance of Motiva and Sun Oil refineries over larger ones with better safety records.

The arbitrator also relied upon provisions of the Omnibus Transportation Employee Testing Act of 1991, 49 U.S.C. § 31306 *et seq.*, and the Department of Transportation regulations promulgated under it, 49 C.F.R. § 382.101 *et seq.* That Act and its regulations allow employees a second chance for rehabilitation. However, that does not mean that a decision to the contrary is unreasonable. This is especially true when we consider the hazardous nature of CITGO's facilities, the need for prompt and unimpaired action in the event of an emergency, and the exception for employees who step forward seeking help for a substance abuse problem that CITGO has included in its policy.[8] Indeed, the Supreme Court has noted that the statute and the regulations at issue leave it to the parties to define appropriate discipline. The Court explained the backdrop of the safety regulations as follows:

[W]hen promulgating these

---

[7]We do not believe that the arbitrator's determination that the zero tolerance policy is unreasonable is supported by the record under CITGO's narrow "abuse of discretion" standard" or under Local 2-991's broader "submission trumps the CBA" standard.

[8] We do not understand how the arbitrator could conclude on this record that it is unreasonable for CITGO to adopt a policy that attempts to pressure impaired employees into stepping forward and seeking help *before* their impairment results in a catastrophe.

regulations, DOT decided not to require employers either to provide rehabilitation or to hold a job open for a driver who has tested positive, on the basis that *such decisions should be left to management/driver negotiation. That determination reflects basic background labor law principles, which caution against interference with labor-management agreements about appropriate employee discipline.*

*Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 65 (2000) (citations omitted) (emphasis added). The arbitrator's award here ignores that caution as well as the express reservation of the employer's prerogatives as set forth in Article III, the Management Rights Clause.

Thus, the fact that Motiva and Sun Oil do not have zero tolerance policies and the fact that a particular federal statute and its implementing regulations allow a second chance, are not sufficient to support a finding that CITGO's zero tolerance policy is unreasonable. This is especially true given the undisputed evidence that the Paulsboro facility is a hazardous work environment susceptible to explosions, Local 2-991 members are

employed in safety-sensitive positions there, and that impaired employees pose a threat to co-workers, the work-place, the environment and to the public at large.

Since the Managements Rights Clause of the CBA (Article III), expressly gives CITGO the right "to make and enforce rules for the maintenance of discipline and safety" and since CITGO § 25.6 of Article XXV precludes either the union or CITGO from using the grievance process to amend the CBA, we are hard-pressed to understand how the arbitrator could have concluded that the zero tolerance policy is unreasonable without substituting his own judgment for CITGO's and ignoring CITGO's expressly reserved right "to make . . . rules for . . . safety."

## V. CONCLUSION

For the above reasons, we will reverse the district court's order enforcing the arbitrator's decision and award, and remand to the district court for an order vacating the arbitration award.

15