**PHILADELPHIA GAS WORKS,**
Appellant,

v.

**GAS WORKERS' EMPLOYEE UNION
LOCAL 686, Service Employees
International Union AFL–CIO.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2003.

Decided Oct. 2, 2003.

Randall J. Sommovilla, Philadelphia, for appellant.

Charles T. Joyce, Philadelphia, for appellee.

BEFORE: PELLEGRINI, Judge, LEADBETTER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge LEADBETTER.

Employer Philadelphia Gas Works (PGW) appeals from the order of the Court of Common Pleas of Philadelphia County (common pleas), which denied its petition to vacate an arbitration award, ordering the award confirmed instead. The award reinstated grievant John Lafferty as an employee of PGW without loss of pay, finding that Lafferty did not violate PGW's residency requirement by staying in the City of Philadelphia several nights a week and spending the remainder of his time at a home located outside of the City.

The issues raised on appeal are whether: (1) the award draws its essence from the collective bargaining agreement (CBA); (2) employer was denied an opportunity to be heard due to the arbitrator's alleged violation of post-hearing procedures; and (3) whether the award is contrary to the public policy that City employees reside in Philadelphia. We affirm.

Lafferty, hired by PGW in 1986, is a member of the Gas Works Employees' Union, Local 686 (Union), which has maintained various CBAs with PGW throughout Lafferty's employment. In 1993, PGW and the Union executed a new residency policy which provided as follows:

> As a condition of active employment with PGW, all employees hired after January 1, 1983 must continuously be a resident of the City of Philadelphia. Employees hired after January 1, 1983 who are already residents of the City must agree to continuously maintain their residence within the City for the duration of their PGW employment. A reasonable period of time, generally not to exceed one year, will be provided for newly hired non-residents to establish their residence within the City.

R.R. 59a. The residency policy also required employees to present at least two forms of acceptable documentary proof of a City residence, including a driver's license, motor vehicle registration, voter's registration, real estate tax bills, lease/rental agreements or deeds, utility bills, income tax returns, insurance records, credit card statements or bank statements.

In 1998, PGW tried to implement a stricter residency policy by unilaterally changing the policy to require all employees to continuously maintain their *domicile* in the City. Pursuant to the domicile policy, "an employee must maintain his/her fixed, permanent and principal home, for

legal purposes, within the City.... Maintaining a part-time residence or using the address of a friend or relative or renting an apartment that is not routinely occupied by the employee, *DOES NOT* meet the domiciliary requirement." (Emphasis in original). The Union grieved PGW's unilateral alteration of the residency policy and an arbitrator ultimately held that PGW could not enforce the stricter policy against the bargaining unit members. Thereafter, PGW required bargaining unit employees to comply with the residency requirement and all non-bargaining unit employees to comply with the domicile requirement.

It is undisputed in this case that Lafferty maintained multiple residences within and without the City during his employment with PGW. In 1986, Lafferty lived with his mother in the City on South 28th Street. In 1987, Lafferty married and moved into a home that he bought in the City on South Dover Street. Lafferty separated from his wife in 1996 but continued to use the Dover Street home. In 1999, Lafferty, his son and current girlfriend moved into an apartment in Philadelphia on Grays Ferry Avenue. Despite the move to the apartment, Lafferty kept clothes and furniture at his Dover Street home and continued to spend time there as well.

Due to his son's special education needs, Lafferty moved out of the Grays Ferry Avenue apartment and bought a home in 2000 in Willow Grove, which is outside of Philadelphia. Lafferty, his son and girlfriend moved to the Willow Grove home but Lafferty also continued to use the Dover Street home in the City, which he shared with Melissa, a different girlfriend. At some point, Lafferty stopped seeing Melissa and started to stay with his moth-

er on South 28th Street. Lafferty began paying his mother rent in early 2001 and, in October of 2001, started paying his mother's gas bill.

Lafferty testified before the arbitrator that he kept clothes and other items at his mother's house, such as a filing cabinet, television and small radio. He also testified that he joined a neighborhood athletic association near his mother's house. According to Lafferty, he also maintained a physical presence at the Willow Grove home, spending several nights a week there; the remainder of the week he spent either at his mother's house or at the house he owned on Dover Street.

In the Spring of 2001, Lafferty was offered two non-bargaining unit positions. According to Lafferty, he declined both positions because he would not be able to comply with the stricter domicile requirement and he would lose benefits afforded to Union members.

PGW's witnesses testified that they first learned of Lafferty's Willow Grove residence in the Summer of 2001, at which time they undertook an investigation, which included surveillance.[1] Based upon the investigation, PGW concluded Lafferty did not maintain a bona fide residence in the City and terminated his employment. The Union grieved Lafferty's termination and the matter proceeded to arbitration.

The arbitrator first noted that the following facts were not disputed by the parties: (1) the residency policy was negotiated and it is a valid term and condition of employment for all bargaining unit members; (2) an employee can have only one domicile but more than one residence; (3) bargaining unit members are subject to the residency requirement and non-bargaining unit members are subject to the

---

1. During the investigation, Lafferty produced a driver's license, voter registration card, ath-letic association membership card and W–2 forms reflecting a home address in the City.

domicile requirement; and (4) PGW had been lax in enforcing the residency requirement and in advising employees of living arrangements that would violate the residency policy.

The arbitrator ultimately concluded that PGW failed to prove that Lafferty violated the residency policy. In support of this conclusion, the arbitrator noted that PGW's investigation was "shoddy and less than thorough" since PGW's investigators only conducted surveillance on Lafferty's Willow Grove home to the exclusion of his residences in the City. In addition, the arbitrator concluded that unlike the domicile policy, the residency policy was not clear in that it failed to define the term "resident," or establish any time or duration component to demonstrate compliance, merely requiring one to be a City resident while employed. The arbitrator noted that when used as a noun, the term resident meant "dweller, inhabitant or occupant." Arbitrator's opinion at 20. The arbitrator further noted that unlike the domicile requirement, the residency policy did not mandate that an employee's City residence be the primary residence. Finally, the arbitrator credited Lafferty's testimony that he spent several nights a week at the South 28th Street home in the City and that this testimony was confirmed by the credible testimony of a neighbor. As the arbitrator noted:

> [S]ince the parties agree it is legally possible and indeed permissible for a person to have and maintain more than one residence, all of [PGW's evidence establishing Lafferty's Willow Grove residence] does not go far enough to prove a [residency requirement] violation. For PGW to prevail, it had to show more. It had to also show that Grievant did not maintain a Philadelphia residence when employed at PGW. This it failed to do.

Arbitrator's opinion at 21. Accordingly, on July 31, 2002, the arbitrator found that Lafferty had a residential connection with the City, sustained the grievance and ordered Lafferty reinstated to his prior position "with no loss of pay, benefits or seniority."

On Tuesday, July 23, 2002, prior to entering his final opinion and award, the arbitrator sent counsel for each party an unsigned draft award with a cover letter stating, "As promised, I am forwarding to you for your review and comment a proposed draft Opinion and Award in the John Lafferty discharge case. I look forward to your comments. It would be my desire to file this Award by next Monday [July 29, 2002]." R.R. 105a. PGW's attorney was apparently on vacation during the week that the arbitrator's draft opinion/award was circulated; counsel did not return to work until Monday July 29, 2002, and left work several hours after arriving due to illness.[2] On Tuesday, July 30th, PGW's attorney called the arbitrator and informed him of his vacation and illness and stated that he intended to comment on the draft after consulting with his client.[3]

The arbitrator signed his award on July 31st and mailed the award to the parties under a cover letter dated August 1. PGW's attorney faxed its comments to the arbitrator the next day, August 2nd. A flurry of letters then ensued, the Union taking the position that PGW's comments were untimely and that the arbitrator lacked the authority to revisit any of the issues or the award, and PGW taking the position that since the arbitrator had invited comments to a draft opinion, the record

---

2. There are no findings in this regard, only counsel's affidavit in support of his motion to vacate the arbitration award.

3. *See* footnote 2.

had not closed when PGW sent its comments. PGW maintained that the arbitrator should withdraw the award or clarify it in light of PGW's comments to the draft. Finally, the arbitrator stated in a letter to the attorneys:

> Unfortunately, there were mis-communications between [PGW's attorney] and me, and I issued the final Award without the benefit of receiving his written comments. I take some of the responsibility for this mis-communication.
>
> [PGW and its attorney] have asked me to reopen hearings and make certain modifications to my Award. The Union has objected to this request. Without the Union's concurrence, I do not have authority to reopen the hearing or to make any formal modifications to the Award.
>
> Because I am without authority to reopen the hearings, [PGW] asked if I could issue a letter of clarification. Since there was no objection, I agreed to do so. On Tuesday, September 3rd, I sent each of you by fax an unsigned draft letter of clarification with the hope it would provide greater clarity with respect to my Award.
>
> Upon reflection, I believe sending a clarification letter is not a good idea and I am writing to advise you that I have decided not to sign or issue my proposed letter of clarification.

Exhibit R to Union's Memorandum of law in opposition to PGW's petition to modify/vacate. PGW then petitioned common pleas to vacate or modify the arbitration award. Common pleas denied the petition and confirmed the award.

PGW first argues that the award does not draw its essence from the collectively bargained residency requirement because the arbitrator ignored the language of the requirement and "crafted standards for determining violations of the requirement that are neither part of the residency requirement nor ever contemplated by the parties." Appellant's brief at 13. Specifically, PGW complains that the arbitrator established a "subjective belief" standard of violation, which permits discipline only if the employee believed that his behavior was not in compliance with the requirement.[4] In addition, PGW complains that the arbitrator also established a "residential connection" standard for compliance, which allows an employee to demonstrate compliance with a "paper residency" through easily obtainable documents.

■ It is well-settled that the scope of review of a grievance arbitration award is the essence test. *Greater Nanticoke Area Sch. Dist. v. Greater Nanticoke Area Educ. Ass'n*, 760 A.2d 1214 (Pa.Cmwlth. 2000). Our Supreme Court recently set forth this test as follows:

> Pursuant to the essence test as stated today, a reviewing court will conduct a two-prong analysis. First, the court shall determine if the issue as properly defined is within the terms of the collec-

---

4. This argument rests on the following language in the arbitrator's opinion:

> Putting myself in Grievant's position, I can comprehend the difficulty he had in clearly understanding exactly where the line was drawn between actionable and non-actionable conduct. In the absence of a clearly defined "bright-line" boundary, it is understandable that fair minded people, acting in good faith, would not necessarily agree there has been a residency violation or for an employee, such as Grievant, to know he was in violation of the Residency Requirement. At the same time, I believe, Grievant knew, as a result of his out of the ordinary living arrangements, he was near or close to crossing the line (wherever it may be), with respect to violating PGW's residence requirements, but had in fact not crossed over the ill defined boundaries of unacceptable conduct.

Arbitrator's opinion at 19.

tive bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State System of Higher Educ. (Cheney Univ.) v. State Coll. Univ. Prof'l Ass'n,* 560 Pa. 135, 150, 743 A.2d 405, 413 (1999).

■ As this court noted in *Greater Nanticoke,* one of the principles underlying the test is that it is the arbitrator's province to interpret the agreement and the arbitrator's construction which is bargained for. 760 A.2d at 1216. Thus, the arbitrator's task is to determine the intention of the contracting parties by examining the collective bargaining agreement and the circumstances surrounding its execution and the courts must respect the award if the arbitrator's " 'interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention . . . .' " *Greene County v. District 2, United Mine Workers of America,* 778 A.2d 1259, 1262 (Pa.Cmwlth. 2001), *alloc. granted,* 568 Pa. 742, 798 A.2d 1292 (2002), quoting *Community Coll. of Beaver County v. Community Coll. of Beaver County, Society of the Faculty (PSEA/ NEA),* 473 Pa. 576, 594, 375 A.2d 1267, 1275 (1977).

■ Here, there is no dispute that the issue of whether PGW had just cause to terminate Lafferty for violation of the residency policy was properly before the arbitrator. PGW, however, quarrels with the arbitrator's interpretation of the residency policy and conclusion that Lafferty did not

violate it with his multiple residences. After a review of the arbitrator's opinion and award, we conclude that it clearly is rationally derived from the residency policy.

As the arbitrator noted, the residency policy is not clear as it does not define the terms "resident" or "residence." Nor does the residency policy delineate the time an employee must spend at a residence in the City to satisfy the residency requirement. Since these factors were not established by the policy, it was the arbitrator's province to define them. In doing so, the arbitrator took guidance from the explicitness of the domicile requirement and the concession that while an employee could have only one domicile, an employee could have more than one residence under the residency policy. As common pleas noted:

> [The arbitrator's] decision is based on his finding that [the residency requirement] was explicitly drafted so as to provide the less strict residency requirement rather than the domicile requirement to the bargaining unit members. By defining and identifying what is prohibited under the domicile requirement, PGW agreed to permit a living arrangement under the residency requirement, namely, the maintenance of a part-time residence, or using the address of a friend or relative, or renting an apartment that is not routinely occupied by the employee.

*Philadelphia Gas Works v. Gas Works Employees Union,* No. 173 September Term 2002, slip op. at 4 (C.C.P.Phila., March 24, 2003). Based on this conclusion, as well as the credited testimony of Lafferty and his neighbor that Lafferty occupied one or two homes in the City part-time during the week, the arbitrator concluded that PGW failed to prove that Lafferty was not a City resident and did not have a City residence.

Contrary to PGW's contention, the arbitrator did not establish a subjective belief standard. The arbitrator's commentary on Lafferty's own beliefs regarding conduct violating the policy merely demonstrated the arbitrator's conclusion that the policy was vague and subject to varying interpretation. Nor did the arbitrator establish a "paper residency" standard. Rather, the arbitrator found that Lafferty satisfied the requirement because he spent time on a weekly basis at his own home in the City or at his mother's where he paid rent and kept personal belongings. Thus, we conclude that the arbitrator's interpretation of the residency policy in this case is rationally derived therefrom.

PGW next argues that vacation of the award is required because the arbitrator issued his final award without considering PGW's comments, thereby deviating from the established post-hearing procedure and denying PGW of an opportunity to be heard. A court may vacate an arbitration award where the irregularity denies a party a hearing or results in an unjust, inequitable or unconscionable award. *See* 42 Pa.C.S. § 7314(a)(1)(i) (relating to vacation of award for grounds permissible in common law arbitration) and (iv) (conducting hearing contrary to Section 42 Pa.C.S. § 7307 such that a party's rights are substantially prejudiced). Moreover, an irregularity that rises to the level which requires vacation of the award has been defined as one which imports bad faith, ignorance of the law and indifference to the justice of the result. *Am. Fed'n of State, County and Mun. Employees v. Borough of State Coll.*, 133 Pa.Cmwlth. 521, 578 A.2d 48, 52 (1990).

■ We agree with common pleas that the arbitrator's failure to consider PGW's comments to the draft does not require vacation of the award. The parties had 3 days of hearings, made closing arguments and submitted post-hearing briefs. Thus, PGW was not denied the opportunity to present the merits of its case or challenge the Union's evidence. Moreover, the fact that the arbitrator was merely seeking comments as opposed to evidence or further argument indicates that the record was closed. The failure to consider PGW's comments does not rise to the level of bad faith, demonstrate ignorance of the law or indifference to the justice of the result.

■ Finally, PGW contends that the award should be vacated because it violates the City's public policy of requiring its employees to live in the City. According to PGW, the policy serves to mitigate the City's loss of population and tax revenues. PGW argues that the award violates this policy because it allows an employee's subjective belief of compliance to satisfy the residency policy rather than requiring an actual physical residency in the City. Similarly, PGW contends that the award allows an employee to demonstrate residency with paper (license, voter registration card, etc.), without proof of an actual, physical residence.

In *W.R. Grace and Co. v. Local Union 759, Internat'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of America*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), the United States Supreme Court held that a court must refrain from enforcing an arbitration award if the CBA, as interpreted by an arbitrator, violates an explicit public policy. *Id.* at 766, 103 S.Ct. 2177. "Such a public policy, however, must be well-defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general consideration of supposed public interests.'" *Id.*, quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945). *Accord Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287 (3d Cir.1996).

In *Cheyney University*, our Supreme Court left open the issue of whether an arbitrator's interpretation of a CBA in a manner that violates public policy is a separate basis to vacate the award or whether such considerations are subsumed within the essence test itself. 560 Pa. at 156 n. 14, 743 A.2d at 417 n. 14.[5] We need not decide whether the violation of public policy presents an independent basis to vacate an arbitration award because PGW has failed to sufficiently demonstrate a well-defined public policy or a violation thereof.

First, PGW has not pointed to any "well defined and dominant" policy established by reference to "laws and legal precedents." [6] Second, the arbitrator found that Lafferty had an actual physical residence in the City. Thus, the award does not contravene any alleged public policy by allowing compliance based upon subjective belief or insufficient paper proof of residency. Third, unlike the sort of rights that a municipality cannot bargain away, such as the right to fire an employee who

has engaged in illegal conduct,[7] the right to require an employee to reside within a certain jurisdiction does not appear to rise to the same level. Indeed, as the Philadelphia Code demonstrates, the Civil Service Commission can waive the requirement.[8]

Accordingly, we affirm.[9]

## ORDER

AND NOW, this 2nd day of October, 2003, the order of the Court of Common Pleas of Philadelphia County in the above captioned matter is hereby AFFIRMED.

---

5. This court has suggested that consideration of whether an award violates public policy falls within the realm of reviewing the award under the essence test. *See Department of the Auditor General v. Council 13, Am. Fed'n of State, County and Mun. Employees*, 688 A.2d 241 (Pa.Cmwlth.1997).

6. PGW does point to Philadelphia Code § 20-101, which requires every employee in the civil service to maintain his bona fide residence in the City. Not only does the provision not apply to employees of PGW, but the Civil Service Commission has discretion to waive the requirement as well. *See* Section 21-101(3).

7. *See City of Easton v. Am. Fed'n of State, County and Mun. Employees*, 562 Pa. 438, 756 A.2d 1107 (2000) (CBA must be construed to take into account that municipality can not relinquish those powers essential to its ability to properly discharge its various functions, including the ability to fire employees who commit illegal conduct).

8. PGW argued in its brief to this court that the award should be vacated to the extent that it awards Lafferty back pay, because Lafferty claimed that he was totally disabled during the period of his termination. However, at oral argument counsel for PGW stated that this issue is premature, and that the amount of back pay due will have to be determined at such time as the award is finally confirmed. We agree, and consider this issue withdrawn from our consideration.

9. The Union requests counsel fees and costs on the grounds that PGW did not have a reasonable chance of prevailing on appeal. Pursuant to Pa. R.A.P. 2744, counsel fees may be awarded where an appeal is frivolous, dilatory, obdurate or vexatious in nature. While PGW's arguments lack merit, we disagree that they are frivolous. Therefore, the motion for counsel fees is denied.